UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IRA FINANCIAL TRUST, | |
| *Plaintiff,* | No. 1:22-cv-04672-AT |
| v. | |
| GEMINI TRUST COMPANY, LLC | |
| *Defendant.* | |

**GEMINI'S MEMORANDUM OF LAW IN SUPPORT
OF MOTION TO COMPEL ARBITRATION**

TABLE OF CONTENTS

Preliminary Statement............................................................................................... 1

Background ................................................................................................................ 2

I.      IRAF Agreed To Arbitrate With Gemini. ...................................................... 2

II.     The Terms of IRAF's Arbitration Agreements. ............................................. 3

III.    IRAF Files This Lawsuit Notwithstanding The Arbitration Agreements. ........................ 4

Argument ................................................................................................................... 4

I.      The FAA Requires Enforcement Of IRAF'S Arbitration Agreement. ................................ 4

    A.      IRAF Agreed To Arbitrate. .................................................................... 5

    B.      IRAF Is Required To Honor Its Arbitration Agreement.............................. 8

        1.      The FAA requires enforcing the parties' agreement to delegate questions of
                arbitrability to the arbitrator to decide. .......................................... 8

        2.      IRAF's claims against Gemini fall within the scope of the arbitration agreement..... 10

II.     This Action Should Be Stayed Against Gemini Pending Arbitration of IRAF's Claims. . 13

Conclusion ............................................................................................................... 13

## TABLE OF AUTHORITIES

Cases                                                                                          Page(s)

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011) .................................................................................................5

*Bar-Ayal v. Time Warner Cable Inc.*,
  2006 WL 2990032 (S.D.N.Y. Oct. 16, 2006) ......................................................9

*Camilo v. Lyft, Inc.*,
  384 F. Supp. 3d 435 (S.D.N.Y. 2019) ..................................................................5

*Carnival Cruise Lines, Inc. v. Shute*,
  499 U.S. 585 (1991) .................................................................................................7

*Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*,
  58 F.3d 16 (2d Cir. 1995) ......................................................................................11

*Contec Corp. v. Remote Sol., Co.*,
  398 F.3d 205 (2d Cir. 2005) ...................................................................................9

*Dhue v. O'Reilly*,
  2018 WL 11222900 (S.D.N.Y. Oct. 10, 2018) ..................................................10

*Emilio v. Sprint Spectrum L.P.*,
  508 F. App'x 3 (2d Cir. 2013) .............................................................................10

*Feld v. Postmates, Inc.*,
  442 F. Supp. 3d 825 (S.D.N.Y. 2020) ..................................................................6

*First Options of Chicago, Inc. v. Kaplan*,
  514 U.S. 938 (1995) .................................................................................................5

*Fteja v. Facebook, Inc.*,
  841 F. Supp. 2d 829 (S.D.N.Y. 2012) ..................................................................7

*Gilmer v. Interstate/Johnson Lane Corp.*,
  500 U.S. 20 (1991) ...............................................................................................13

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  139 S. Ct. 524 (2019) ..............................................................................................8

*Hidalgo v. Amateur Athletic Union of U.S., Inc.*,
  468 F. Supp. 3d 646 (S.D.N.Y. 2020) ..................................................................6

*Ins. Co. of N. Am. v. ABB Power Generation, Inc.*,
　925 F. Supp. 1053 (S.D.N.Y. 1996).........................................................................12

*Kindred Nursing Ctrs. Ltd. P'ship v. Clark*,
　137 S. Ct. 1421 (2017) ............................................................................................5

*Lamps Plus, Inc. v. Varela*,
　139 S. Ct. 1407 (2019) ..........................................................................................13

*Mackris v. O'Reilly*,
　2019 WL 11000205 (S.D.N.Y. Mar. 6, 2019) ......................................................10

*Meyer v. Uber Techs.*,
　868 F.3d 66 (2d Cir. 2017).......................................................................................6

*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*,
　473 U.S. 614 (1985).................................................................................................12

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
　460 U.S. 1 (1983)......................................................................................................5

*Rent-A-Center, W., Inc. v. Jackson*,
　561 U.S. 63 (2010)....................................................................................................8

*Shaw Grp. Inc. v. Triplefine Int'l Corp.*,
　322 F.3d 115 (2d Cir. 2003)...................................................................................11

*Sultan v. Coinbase, Inc.*,
　354 F. Supp. 3d 156 (E.D.N.Y. 2019) ......................................................................6

*United States v. Konn*,
　634 F. App'x 818 (2d Cir. 2015) ..............................................................................5

Statutes

9 U.S.C. § 2.......................................................................................................................4

9 U.S.C. § 3.....................................................................................................................13

9 U.S.C. §§ 1-16 ...............................................................................................................1

New York GBL § 349........................................................................................................4

Defendant Gemini Trust Company, LLC ("Gemini"), submits this memorandum of law in support of its motion to compel arbitration of claims brought by Plaintiff IRA Financial Trust Company ("IRAF") and stay this action pending the outcome of arbitration.

PRELIMINARY STATEMENT

Gemini offers an online platform for buying, selling, transferring, and storing cryptocurrencies. In 2019, IRAF created an account on Gemini's platform to offer its customers cryptocurrency investment options. IRAF's claims arise from a February 2022 incident in which third parties compromised IRAF's security systems and administrative controls, leading to the loss of the cryptocurrency investments of IRAF's customers.

Instead of accepting responsibility for the failure of its systems, IRAF filed this lawsuit rife with disparaging, inflammatory allegations and groundless claims against Gemini. But this motion does not involve the merits of IRAF's claims (or lack thereof). Rather, it presents a threshold procedural issue: IRAF cannot bring its claims in this Court. To use Gemini's platform, IRAF— like all Gemini customers—was required to enter into Gemini's User Agreement. When IRAF did so, it agreed to arbitrate "any controversy, claim, or dispute arising out of or relating to this User Agreement." Freeman Decl.[1], Ex. 4 at 62, Ex. 5 at 74. The Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), requires IRAF to honor its obligation.

As detailed below, Gemini's contract formation process—which requires its users to check a box to accept the User Agreement when creating an account—readily satisfies New York law. This Court should enforce the resulting arbitration agreement because: (1) the agreement expressly

---

[1] Declaration of Travis Freeman, dated July 28, 2022, filed in conjunction with this motion.

delegates the issue of arbitrability to an arbitrator; and (2) the agreement broadly requires that all disputes relating to the User Agreement be arbitrated.

BACKGROUND

**I.      IRAF Agreed To Arbitrate With Gemini.**

IRAF applied to become an institutional client of Gemini on September 16, 2019.  Freeman Decl.  ¶ 6.  IRAF's application was signed by its President, Adam Bergman, who certified that he was legally authorized to represent the company and transact on its behalf and agreed that Gemini would be relying on the accuracy of this certification.  *Id*. at ¶ 6 & Ex. 1 at 12.

Gemini's compliance team reviewed and approved IRAF's application, creating institutional account number ***5190 for IRAF. Subsequently, Gemini approved two additional institutional accounts for IRAF—numbers ***2072 and ****6844.[2]  *Id*. at ¶ 7.  IRAF's institutional accounts remained inactive and inaccessible until an administrator – an IRAF representative – opened an administrator account.  *Id*.  To do so, an individual had to use Gemini's account registration page at https://exchange.gemini.com/register.  *Id*. at ¶ 8 & Ex. 2.  On the registration webpage, the individual was required to enter his or her full name, email address, and a password.  *Id*.  Before proceeding further, the individual was required to affirmatively check a box indicating consent to the terms of Gemini's User Agreement.  *Id*.  The box appeared as follows:



*Id*.  The underlined phrases "User Agreement" and "Privacy Policy" each hyperlinked to the full

---

[2]     Account ***2072 was created because account ***5190 exceeded the maximum permissible number of sub-accounts, i.e., accounts of IRAF's customers.  Account ****6844 was created at IRAF's request after IRAF's February 8 security breach but was never used.

2

text of the respective document on Gemini's website so the individual could review it.  *Id*.  It was (and still is) impossible to create an administrator account without checking the above box expressly indicating agreement to the User Agreement.  *Id*. at ¶ 9.  Continuing the signup process required an individual to click a separate button with the text "Open an account."  If an individual has not checked the box agreeing to the User Agreement, the "Open an account" button remained grayed out and inoperable.  *Id*.

Gemini's electronic log reflects that IRAF's President Adam Bergman first agreed to the User Agreement on October 4, 2019, at 5:08 pm.  *Id*. at ¶¶ 10-11 & Exs. 3-4.  His most recent login and acceptance of an amended User Agreement (the "Amended User Agreement") took place on April 7, 2021 at 9:07 pm.  *Id*. at ¶ 11 & Exs. 3, 5.  Both User Agreements include a mandatory arbitration clause.  *Id*. at ¶ 12 & Ex. 4 at 62-64, Ex. 5 at 74-77.

Both User Agreements also provide that, by accessing or using Gemini's API, the user is agreeing to enter into Gemini's API Agreement and supply a link to the full text of the API Agreement.  *Id*. at ¶ 13 & Ex. 4 at 18-19; Ex. 5 at 15.  IRAF's President Adam Bergman first agreed to the API Agreement on October 4, 2019, at 5:08 pm.  *Id*. at ¶ 15 & Ex. 6.  His most recent login and acceptance of an Amended API Agreement (the "API Agreement") was on April 7, 2021 at 9:07 pm.  *Id*. at ¶ 15 & Ex. 7.  The process followed by IRAF is standard. It is impossible to activate and use an institutional account without accepting the User Agreement. *Id.* at ¶¶ 7-9 & Ex. 2.  The steps described above for Mr. Bergman's account were repeated multiple times by other IRAF users.  *Id.* at ¶ 10 & Ex. 3.

## II.    The Terms of IRAF's Arbitration Agreements.

The User Agreement provides in relevant part:

> You agree and understand that ***any controversy, claim, or dispute arising out of or relating to this User Agreement or the breach thereof shall be settled solely and***

3

***exclusively by binding arbitration held in New York, New York, administered by JAMS*** and conducted in English, rather than in court. You expressly agree that any dispute about the scope of this User Agreement to arbitrate and/or the arbitrability of any particular dispute shall be resolved in arbitration in accordance with this section. …

Freeman Decl., Ex. 4 at 62 (emphasis added).  The Amended User Agreement contains a materially identical arbitration clause with the exception of providing that an arbitration is to take place where the user resides or another mutually agreeable location.  *Id*. at ¶ 11 & Ex. 5 at 74.

The API Agreement and the Amended API Agreement expressly incorporate the User Agreement, as amended, which includes the arbitration clause.  *Id*. at ¶ 15 & Ex. 6 at 3, Ex. 7 at 2-3.

## III.    IRAF Files This Lawsuit Notwithstanding The Arbitration Agreements.

Despite its arbitration agreement with Gemini, IRAF filed this lawsuit on June 6, 2022. Compl., Dkt. No. 1.  In the Complaint, IRAF attempts to blame Gemini for the breach of its own security systems.  To that end, IRAF alleges that it relied on Gemini's representations regarding its security protocols and that "[b]ut for Gemini's fundamentally flawed API security architecture, the[] losses [*i.e.*, the theft of crypto funds] would not have occurred."  Compl. ¶ 17.  Based on these allegations (which are squarely contradicted by the User Agreement), IRAF asserts claims against Gemini for fraud, negligence, gross negligence, violations of New York GBL § 349, contribution, defamation, and tortious interference.  Compl. ¶¶ 122-67.  At an appropriate time, Gemini will demonstrate that IRAF's claims are meritless.

### ARGUMENT

## I.    The FAA Requires Enforcement Of IRAF'S Arbitration Agreement.

The FAA governs any arbitration agreement that is "written" and in a contract "evidencing a transaction involving commerce." 9 U.S.C. § 2. Here, both criteria are met: (i) the arbitration agreement is in writing, Freeman Decl., Exs. 4-5, and (ii) contracts related to the use of an online

crypto-trading platform plainly involve interstate commerce, because "there can be no question that the Internet is a channel and instrumentality of interstate commerce." *United States v. Konn*, 634 F. App'x 818, 821 (2d Cir. 2015); *Camilo v. Lyft, Inc.*, 384 F. Supp. 3d 435, 439 (S.D.N.Y. 2019) (FAA applied to Lyft's online Terms of Use Agreement that contained an arbitration clause).

Under the FAA, IRAF's arbitration agreement is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" 9 U.S.C. § 2. As the Supreme Court has explained, "[t]he overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). This "'liberal federal policy favoring arbitration agreements'" applies "'notwithstanding any state substantive or procedural policies to the contrary.'" *Id.* at 346 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

Here, no grounds "exist at law or in equity for the revocation of" IRAF's arbitration agreement.

### A.    IRAF Agreed To Arbitrate.

To determine whether a valid arbitration agreement has been formed, a court must "apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). But only "generally applicable" contract rules apply; state-law rules that "discriminat[e]" against or "disfavor[]" arbitration agreements are preempted by the FAA. *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017).

As detailed above, IRAF agreed to the Gemini User Agreement on October 4, 2019 when IRAF's representative checked a box acknowledging that "By creating this account, you agree to

our User Agreement and Privacy Policy."   The phrase "User Agreement" was an underlined hyperlink to the full terms, including the arbitration agreement.  Freeman Decl., Ex. 2.

The rules of contract formation are no different when an individual engages in a transaction on an electronic device or the Internet, and courts have explained that "'[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract.'"   *Meyer v. Uber Techs., LLC*, 868 F.3d 66, 75 (2d Cir. 2017) (citations omitted); *Sultan v. Coinbase, Inc.*, 354 F. Supp. 3d 156, 159-62 (E.D.N.Y. 2019) (holding that an arbitration agreement was formed under New York law by completing a similar sign-up process on a different online cryptocurrency exchange platform).

Whether on paper or on a screen, courts require a "reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms[.]" *Meyer*, 868 F.3d, at 75 (alteration and quotation marks omitted)[3]; *accord Sultan*, 354 F. Supp. 3d at 159 (same). The offeree does not have to have actual notice.  Rather, inquiry notice is sufficient.  *Meyer*, 868 F.3d, at 74-75 ("Where there is no evidence that the offeree had actual notice of the terms of the agreement, the offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms."); *accord Hidalgo v. Amateur Athletic Union of U.S., Inc.*, 468 F. Supp. 3d 646, 654 (S.D.N.Y. 2020) (same) (quotation marks omitted).

The contract formation process here readily complies with these requirements.  As the Second Circuit explained, "[c]ourts routinely uphold" agreements "which require users to click an 'I agree' box after being presented with a list of terms and conditions of use[.]"  *Meyer*, 868 F.3d, at 75 (collecting cases); *see also Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 830-33 (S.D.N.Y.

---

[3]    *Meyer* was decided under California law, but "New York's law of contract formation is substantially similar to the law of [California]." *Sultan*, 354 F. Supp. 3d at 161, n.1.

2020) (enforcing an arbitration clause in the Terms of Use that were hyperlinked and required a user to click a button indicating consent); *Hidalgo*, 468 F. Supp. 3d, at 656-60 (same); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 838-41 (S.D.N.Y. 2012) (same). "That the contents of the [the agreement] do not appear on the screen or that [the movant] does not require a 'user to actually examine the terms before assenting' does not change the analysis." *Feld*, 442 F. Supp. 3d, at 831 (citing *Fteja*, 841 F. Supp. 2d, at 837-38). "[C]licking the hyperlinked phrase is the twenty-first century equivalent of turning over the cruise ticket to read the fine print." *Id.* at 831 (citing *Fteja*, 841 F. Supp. 2d, at 839) (referring to *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 587-88 (1991), in which the Supreme Court enforced contract terms that directed consumer to review them elsewhere).

In *Meyer*, *Feld*, *Hidalgo*, and *Fteja*, as here, the full terms were available via a hyperlink on the relevant screen. The signup page here is at least as "uncluttered", *Meyer*, 868 F.3d, at 78, as the webpages in the above cases. Freeman Decl., Ex. 2. Further, the "By opening an account, you agree to our User Agreement and Privacy Policy" disclosure is in the same font as the rest of the webpage and uses a conspicuous black font against white background.

If anything, because IRAF's representative was required to click an "affirmative assent clickbox, drawing attention to the text *immediately*" beside the clickbox, the degree of notice and assent is even greater than in *Meyer* which did not require users to click a separate button indicating consent to the User Agreement before registering for the website. *Compare Meyer*, 868 F.3d, at 76 (the user had to click only one button—"Register"—while a hyperlink to the Terms of Use was located under that button), *with* Freeman Decl., Ex. 2 (IRAF had to click a checkbox to consent to the User Agreement and then had to click another "Open an account" button to proceed with registering an account at Gemini). As the Eastern District of New York put it, "[t]he explicit

acceptance required here is an even clearer signal that a[n] account would be subject to terms and conditions, and an even stronger prompt to a reasonably prudent user to click on the link to see what those terms and conditions were before agreeing." *Sultan*, 354 F. Supp. 3d, at 161.

In sum, IRAF assented to the arbitration provision in the User Agreement when IRAF's President Adam Bergman checked the box next to the "By opening an account, you agree to our User Agreement and Privacy Policy" disclosure which hyperlinked to the full text of the User Agreement. Freeman Decl. ¶ 11 & Exs. 2, 4. Further, IRAF agreed that "by logging into [a Gemini] account or authenticating to [Gemini's] API with [IRAF's] API key following any change to th[e] User Agreement, [such] login or API Authentication, as applicable, shall constitute [IRAF's] agreement to the amended User Agreement … and … [IRAF] agree[s] to be legally bound by its terms and conditions as amended." *Id*. at ¶ 11 & Ex. 4 at 7. IRAF's President Adam Bergman consented to the Amended User Agreement—which also contains a mandatory arbitration clause—by logging in on April 7, 2021. *Id*. at ¶ 11 & Ex. 5 at 74-77. Accordingly, IRAF cannot reasonably dispute that it entered into a binding arbitration agreement with Gemini.

**B.   IRAF Is Required To Honor Its Arbitration Agreement.**

**1.   The FAA requires enforcing the parties' agreement to delegate questions of arbitrability to the arbitrator to decide.**

The Supreme Court has repeatedly held that "if a valid [arbitration] agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, *a court may not decide the arbitrability issue*." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (emphasis added); *see also Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party

seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Rent-A-Center*, 561 U.S., at 70.

Accordingly, "[j]ust as a court may not decide a merits question that the parties have delegated to an arbitrator, a court may not decide an arbitrability question that the parties have delegated to an arbitrator." *Henry Schein*, 139 S. Ct., at 530.  And the Supreme Court "has consistently held that parties may delegate threshold questions of arbitrability to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence." *Id.* (quoting *First Options*, 514 U.S., at 943); *see also*, *e.g.*, *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 209 (2d Cir. 2005) (enforcing agreement to delegate questions of "existence, scope or validity" of the agreement to the arbitrator); *accord Hidalgo*, 468 F. Supp. 3d, at 661 (enforcing delegation clause). That standard is met here for two independent reasons.

*First*, the User Agreement and the Amended User Agreement expressly provide "that any dispute about *the scope of this User Agreement to arbitrate* and/or *the arbitrability of any particular dispute* shall be resolved in arbitration."  Freeman Decl., Ex. 4 at 62, Ex. 5 at 74 (emphases added).  This language constitutes clear and unmistakable evidence of delegation.  *See, e.g., Bar-Ayal v. Time Warner Cable Inc.*, No. 03 Civ. 9905 (KMW), 2006 WL 2990032, at *7-8 (S.D.N.Y. Oct. 16, 2006) (a clause providing that "the arbitrability of disputes shall be determined by the arbitrator ... constitutes sufficiently clear and unmistakable evidence that the parties intended to have issues of arbitrability decided by the arbitrator").

*Second*, the User Agreement calls for the arbitration to be administered by JAMS "in accordance with the then prevailing JAMS Comprehensive Arbitration Rules & Procedures." Freeman Decl. Ex. 4 at 63.  Rule 11(b) of those JAMS Rules provides that jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or

scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, *shall be submitted to and ruled on by the Arbitrator*.  The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.  *See* https://www.jamsadr.com/rules-comprehensive-arbitration/ (last visited June 28, 2022) (emphasis added).

"[I]t is settled law in this Circuit that when the parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, 'the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.'"  *Mackris v. O'Reilly*, 17cv9483 (DAB), 2019 WL 11000205, at *5 (S.D.N.Y. Mar. 6, 2019) (quoting *Contec*, 398 F.3d at 208).  The Second Circuit Court of Appeals and this Court have expressly applied this rationale to incorporation of JAMS Rules finding that it constitutes a valid delegation.  *Emilio v. Sprint Spectrum L.P.*, 508 F. App'x 3, 5 (2d Cir. 2013) ("the parties clearly and unmistakably delegated questions of arbitrability to the arbitrator" because "[t]he arbitration clause in the parties' agreement states that 'the then-applicable rules of JAMS will apply'"); *see also Dhue v. O'Reilly*, No. 18cv2547 (DAB), 2018 WL 11222900, at *4 (S.D.N.Y. Oct. 10, 2018) ("Incorporating the JAMS Comprehensive Arbitration Rules is 'clear and unmistakable evidence' that the parties delegated questions of arbitrability to the arbitrator.").

In short, given the parties' clear agreement that an arbitrator should decide arbitrability, the FAA requires courts to "respect the parties' decision as embodied in the contract" and enforce the delegation requirement.  *Henry Schein*, 139 S. Ct. at 531.

>    2.    **IRAF's claims against Gemini fall within the scope of the arbitration agreement.**

Under the binding Supreme Court and Second Circuit precedent discussed above, the FAA requires this Court to send to the arbitrator the question of whether IRAF's underlying claims

10

against Gemini are subject to arbitration.  But if the Court were to reach the question of scope, the answer is simple: IRAF's arbitration agreement expressly covers its claims against Gemini.

Specifically, the agreement requires arbitration of "any controversy, claim, or dispute arising out of or relating to this User Agreement or the breach thereof."  Freeman Decl., Ex. 4 at 62, Ex. 5 at 74.  The Second Circuit has held that such language leaves "no doubt" that "any disputes with the Agreement's other signatory" must be arbitrated.  *Contec Corp.*, 398 F.3d at 208; *see also Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 120-21 (2d Cir. 2003) (discerning a "clear and unmistakable intent to submit questions of arbitrability to arbitration" from the parties' agreement to arbitrate "[a]ll disputes ... concerning or arising out of this Agreement"); *Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995) ("The clause in this case, submitting to arbitration '[a]ny claim or controversy arising out of or relating to th[e] agreement,' is the paradigm of a broad clause[.]").

Consistent with the above case law, Plaintiff's claims squarely fall within the scope of the broad arbitration clause.  The User Agreement and the Amended User Agreement govern access to and use of the Gemini online platform and Gemini API.  Freeman Decl., Ex. 4 at 10, Ex. 5 at 4-5, Ex. 6 at 3, Ex. 7 at 3.  They also address unauthorized access to accounts—the primary focus of IRAF's Complaint.  Compl. *passim*.  For example, the Agreements provide—contrary to IRAF's allegations—that "*we are not responsible (and you will not hold us responsible) for any unauthorized access to or use of your User Account and/or your Gemini Account*."  Freeman Decl., Ex. 4 at 10, Ex. 5 at 5 (emphasis in the original).

Further, the User Agreement and the Amended User Agreement address the mode of communications between Gemini and IRAF.  Notably, they foreclose IRAF's complaints about e-mail being the only mode of communication with Gemini.  *Compare* Compl. ¶ 98 (complaining

that "Gemini refused to provide a phone number, and thus IRA could only contact Gemini via email") *with* Freeman Decl., Ex. 4 at 10, Ex. 5 at 5 ("If you notice any unauthorized or suspicious activity in your account, please email support@gemini.com or security@gemini.com and notify us immediately. … You agree and understand that all communication with you will be via email.").

In addition, the User Agreement and the Amended User Agreement contain the parties' agreement regarding the limited scope of Gemini's digital asset insurance—contrary to Plaintiff's allegations that Gemini made misrepresentations regarding its insurance. *Compare* Compl. ¶ 115 ("[C]ontrary to its representations, Gemini is taking the position that the stolen crypto assets are not covered by Gemini's insurance[;]") *with* Freeman Decl., Ex. 4 at 31, Ex. 5 at 30 (explaining that Gemini maintains insurance for digital assets in Gemini's online hot wallet but that the "***policy does not cover any losses resulting from any unauthorized access to your User Account***")

As such, IRAF's claims against Gemini arise out of or at the very least relate to the original and amended User Agreement.  Gemini again denies that IRAF's claims have merit, but the premise of these claims is based entirely on the access to and use of Gemini's online platform and API which are governed by the original and amended User Agreement and API Agreement which in turn incorporate the User Agreement.  In sum, all of IRAF's claims against Gemini "touch matters covered" by these Agreements and are therefore arbitrable.  *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 624 n.13 (1985); *see also Ins. Co. of N. Am. v. ABB Power Generation, Inc.*, 925 F. Supp. 1053, 1062 (S.D.N.Y. 1996) ("[T]ort claims are covered by contractual agreements to arbitrate if the factual allegations underlying the claims are related to matters that are clearly arbitrable.").

Even if there were any uncertainty as to whether IRAF's claims fall within the scope of this arbitration agreement—and there is none—"as a matter of federal law, any doubts concerning

the scope of arbitrable issues should be resolved in favor of arbitration[.]"  *Moses H. Cone*, 460 U.S. at 24-25.  As the Supreme Court has reiterated, the "FAA provides the default rule for resolving certain ambiguities in arbitration agreements[,]" including the rule "that ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration," and that rule preempts any state law to the contrary.  *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418-19 (2019) (citing *Mitsubishi Motors Corp.*, 473 U.S. at 626; *Moses H. Cone*, 460 U.S. at 24-25)).

In short, IRAF's claims against Gemini are covered by the arbitration agreement.

## II.    This Action Should Be Stayed Against Gemini Pending Arbitration of IRAF's Claims.

When, as here, the FAA governs an arbitration provision that covers plaintiff's claims, Section 3 of the FAA directs the district court to compel arbitration and stay those claims.  *See* 9 U.S.C. § 3 (providing for a stay of court proceedings pending the resolution of arbitration); *see also*, *e.g.*, *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991).

## CONCLUSION

The Court should enter an order (i) compelling IRAF to arbitrate its claims against Gemini in accordance with the arbitration agreement; and (ii) staying this action against Gemini pending the outcome of arbitration.

Dated: New York, New York
       July 28, 2022

JFB LEGAL, PLLC

By /s/ John F. Baughman

John F. Baughman
Maryia Y. Jones
Daniel A. Schwartz
299 Broadway – Suite 1816
New York, NY 10007
(212) 548-3212

*Attorney for Gemini Trust Company, LLC*

13